## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

MARTHA A. CESERY TAYLOR, an individual residing in Florida, and WALTER Q. TAYLOR, an individual residing in Florida

      Plaintiffs,

v.

DAVID E. K. PANICO, an individual residing in Colorado,

and

JANICE L. PANICO a/k/a JAN PANICO, an individual residing in Colorado,

and

CAROL DOPKIN, an individual residing in Colorado,

and

CAROL DOPKIN REAL ESTATE AND RANCH, INC., a/k/a CAROL DOPKIN REAL ESTATE, INC., a Colorado Corporation,

      Defendants.

---

## COMPLAINT

---

Plaintiffs, Martha A. Cesery Taylor and Walter Q. Taylor (Ms. Cesery Taylor, and Mr. Taylor, respectively, or collectively the "Plaintiffs"), through their attorneys, IRELAND, STAPLETON, PRYOR & PASCOE, P.C., submit the following Complaint against David E. K. Panico and Janice L. Panico a/k/a Jan Panico (hereinafter "Mr. Panico" and "Ms. Panico," respectively, or collectively the "Sellers") and Carol Dopkin (hereinafter "Dopkin") and Carol

Dopkin Real Estate and Ranch, Inc. ("CDRI"). The Sellers, Dopkin and CDRI may be referred to herein as "Defendants." Plaintiffs further for their Complaint state as follows:

## I.    JURISDICTION AND VENUE

1.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because there is complete diversity as Plaintiffs and Defendants are citizens of different states. Plaintiffs are citizens and residents of the State of Florida, and Defendants are citizens and residents of the State of Colorado. The value of the claims against each Defendant, exclusive of interest and costs, exceeds the sum specified in 28 U.S.C. § 1332.

2.      Venue in Colorado is proper pursuant to 28 U.S.C. § 1332, as the Defendants' residence, and the place where all of the significant events occurred, including the primary issue in controversy — Plaintiffs' 2005 purchase of the property located at 1533 Juniper Hill Drive, Aspen, Colorado 81611 (the "Juniper Property").

## II.    PARTIES

3.      Plaintiffs are individuals with a residence at 1431 First Street South Jacksonville, Florida 32250.

4.      Defendants Mr. and Ms. Panico are individuals with a residence at 403 Skipper Drive, Carbondale, Colorado 81623 and are the former owners of the Juniper Property.

5.      Defendant Dopkin is an individual with a residence at 2112 McLain Flats Road, Aspen, Colorado 81612.

6.      Defendant CDRI is a Colorado corporation, having its principal place of business at 122 West Main Street, Aspen, Colorado 81611.

## III.    GENERAL ALLEGATIONS

### Plaintiffs' Agent

7.    On or about January 15, 2005, Plaintiffs asked Dopkin and CDRI to assist them in locating a second home for purchase in and around Aspen, Colorado.

8.    Although there was no written agreement between the parties, Plaintiffs understood that Dopkin and CDRI would be working for Plaintiffs on their specific requirements and behalf.

9.    Dopkin and CDRI accepted the engagement, but provided neither a verbal nor written disclaimer regarding the scope of the efforts they were undertaking for Plaintiffs, in violation of C.R.S § 12-61-808 (2)(a)(1), nor did Dopkin and CDRI describe the different type of brokerage relationships available under Colorado law.

10.    At the time of that engagement, Plaintiffs had recently sold a property in Telluride, Colorado, and were looking to complete a replacement purchase pursuant to Internal Revenue Code § 1031 (tax-free exchange), with a threshold deadline of March 31, 2005 (the "1031 Deadline").

11.    From the outset, Plaintiffs informed Dopkin and CDRI of certain, specific medical concerns that influenced the suitability of various properties, including Ms. Cesery Taylor's acute asthma and resulting sensitivity to mold and other harmful allergens, and Mr. Taylor's need, due to a heart condition, to be located close to medical facilities. Because Plaintiffs reside in Florida, Plaintiffs relied upon Dopkin and CDRI to find a home that fit their specific needs.

12.     For the most part, Plaintiffs reviewed listings suggested by Dopkin and CDRI via the Internet.  However, on one occasion in January, Ms. Cesery Taylor traveled to the Aspen area to view a property suggested Ms. Dopkin, which was located by a stream.  After the second visit, she rejected that property because of concerns about a mold and mildew smell.  Following that visit, in conversations with Dopkin and CDRI, Ms. Cesery Taylor reiterated her requirement that the property be "clean."

13.     On February 14, 2005, at Dopkin's urging, Plaintiffs viewed the Juniper Property online.  As with virtually every other property recommended by Dopkin, the Property was a CDRI listing.  In the case of the Property, the listing broker was Rita Sherman, an associate in the CDRI office that Dopkin owned and managed.

## The Contract for the Juniper Property

14.     On or about February 24, 2005, Plaintiffs authorized Ms. Dopkin and CDRI to submit to Sellers a Contract to Buy and Sell Real Estate to Sellers, to beat the looming and imperative 1031 Deadline.  A copy of the accepted Contract is attached as **Exhibit 1**, together with certain amendments and modifications.

15.     One of the contingencies in the Contract was an inspection of the Juniper Property.  Plaintiffs reasonably expected that the scope of that inspection would conform to the Juniper Property's qualification generally and specifically to their medical requirements.  Purportedly on Plaintiffs' behalf, Dopkin and CDRI engaged AmeriSpec Home Inspection Service ("AmeriSpec"), to perform the inspection, which occurred on or about March 16, 2005.  According to the report generated, and contrary to Plaintiffs' expectations and Dopkin and CDRI's duties, AmeriSpec performed a limited, visual home inspection and tested for radon,

asbestos contamination and the presence of lead. AmeriSpec was apparently denied access to closets and crawl spaces, and did not perform any tests for molds or other allergens.

16.    Plaintiffs did not receive a copy of the inspection report until Ms. Cesery Taylor arrived in Colorado a week later, at which time Harrison Sachs of CDRI handed her a copy at the airport amidst a number of other documents. At no time did Dopkin or anyone from CDRI inform Plaintiffs of the limited scope of the inspection they had obtained on Plaintiffs' behalf.

17.    Sometime between March 25 and April 1, 2005, Ms. Cesery Taylor and her young daughter toured the Juniper Property. The Property was snow covered, obscuring any view of the area surrounding the foundation of the dwelling, or any view of grading and drainage patterns proximate to the dwelling.

18.    Inside the dwelling, there were several unfinished areas. In conversations with Ms. Cesery Taylor, Mr. Panico represented to that he was an able architect and builder. He stated that he had designed the home on the Juniper Property and supervised its construction.

19.    In the laundry room, Ms. Cesery Taylor told Mr. Panico that she was concerned about a moldy smell. Mr. Panico assured Ms. Cesery Taylor that the smell was a cat litter box.

20.    Ms. Cesery Taylor also was unable to see behind heavy bookcases, and was told by Mr. Panico that a locked closet was "filled to the brim" with papers and art supplies.

21.    When Ms. Cesery Taylor indicated that she liked the Juniper Property, but was concerned about certain unfinished aspects and deficiencies of the home, Mr. Panico showed and later provided her with plans he had drawn to attach a garage on the northeastern end of the home and rework the entryway level, and offered to stay in the home to supervise its completion

and the landscaping improvement Ms. Cesery Taylor desired. The garage and reworked

entryway were particularly important to Plaintiffs as a result of Mr. Taylor's heart condition.

      22.      Ms. Cesery Taylor later met with her preferred Aspen builder, Pat Fenton of

Fenton Construction, and Mr. Panico at the Juniper Property to discuss the improvements to the

home. Mr. Panico offered to coordinate the work for Plaintiffs, in partial consideration for

Plaintiffs' agreement to allow Sellers to remain living on site for a few weeks after the closing on

the Juniper Property. The parties modified the contract accordingly, including a reduction in

price, delayed the closing to May 12, 2005, and agreed that Mr. Panico would work directly with

Plaintiffs' contractor of choice on the improvements.

      23.      Shortly after this visit, Ms. Cesery Taylor experienced severe respiratory

problems and was placed under a doctor's care in Aspen and again upon her return to Florida, but

she attributed the illness to a "sick" plane. Based upon her prior experience with the streamside

property, she believed that Dopkin and CDRI would never have shown her a mold-infested

property, and she believed the statements of Rita Sherman and other CDRI representatives that

the Juniper Property had been thoroughly and professionally inspected.

      24.      In connection with the purchase contract, Sellers had both signed Property

Disclosures which stated in pertinent part:

| G. | STRUCTURAL CONDITIONS<br>To Seller's current actual knowledge, do any of the following conditions now exist or have they ever existed: | Yes | No | Do Not Know | Comments |
|---|---|---|---|---|---|
| 1. | Structural problems | | X | | |
| 2. | Moisture and/or water problems | X | | | HAD LEAK @ WATER LINE THROUGH FOUNDATION |

| | | | | | YEAR AFTER MOVING IN |
|---|---|---|---|---|---|
| 3. | Damage due to termites, other insects or rodents | X | X | | HAD DAMAGE TO STEREO AND PHONE LINES FROM RODENTS |
| 4. | Damage due to wind, fire or flood | | X | | |

Although the initial date of Sellers' signature on the Disclosure was May 20, 2004, and they

signed an identical document again on March 1, 2005, the Disclosure was not transmitted to

Plaintiffs until May 6, 2005, and not countersigned by Plaintiffs until May 15, 2005.

Accordingly, Plaintiffs relied more upon Sellers' verbal description of the home they had built

and lived in for 17 years than on the Disclosure.  Even if the Disclosure had been timely tendered

and discussed, at most Plaintiffs would have been put on notice that there had been a one time

water leak 16 years earlier, which had been repaired, a rodent intrusion that had damaged some

wiring that was repaired, and no other structural or water-related problems with the house on the

Property.

     25.     Plaintiffs closed on the Juniper Property through a title company on May 12,

2005.  According to the terms of the closing documents and the agreement of the parties, the

Sellers were permitted to reside on the Juniper Property until June 15, 2005.

### The Hidden Conditions

     26.     Following the closing, Plaintiffs paid more than $150,000 for certain

improvements and enhancements, primarily to the site and not the house on the Property,

although some cosmetic work was done to the interior.  Mr. Panico supervised the work.  The

garage project was never started, despite Mr. Panico's written representation that a permit could

"probably" be obtained in about two months.  Mr. Panico claimed that the builder Ms. Cesery

Taylor had selected did not follow up as promised, so Mr. Panico called an "old friend" to perform the repairs and improvements that were made.

27.    In July 2005, Ms. Cesery Taylor arrived at the Property with her belongings, intending to take possession of the Juniper Property and begin her residence there. She immediately discovered that the home was uninhabitable for her and her family. Rodent droppings and urine were visible on the carpeting. A musty smell was overwhelming. After less than an hour's exposure, she became sufficiently ill that she required repeated medical consultation and treatment.

28.    During that visit, Ms. Cesery Taylor further realized that the garage Mr. Panico had drawn extended toward a flowing stream and could not be permitted or built.

### Subsequent Investigations

29.    Unable to return to or inhabit the Juniper Property, Plaintiffs commissioned various investigations to determine the severity of the damage that had been hidden from them, and the cost of restoring the Juniper Property to the condition Sellers represented.

30.    Unfortunately, environmental testing revealed severe mold and toxic allergen infestation throughout the structure. Copies of the reports reflecting that testing are attached as **Exhibit 2**.

31.    The severity of the mold and toxic allergen contamination problem established that it had developed over a number of years, and was rampant at the time the purchase occurred in 2005.

32.    In order to remediate the home, the entire structure will need to be stripped to the studs, cryoblasted, sealed, and then rebuilt, at an estimated cost of $200,000 or more.

10902.0200 #347166 v8

8

33.    The rodent droppings Ms. Cesery Taylor discovered in July 2005 also were not an isolated problem of recent onset. Crawl spaces underneath portions of the dwelling are filled, as much as six inches deep, in rodent feces, mixed with water that intrudes into the home on a constant basis.

34.    The cost of cleaning and then repairing the home to prevent further rodent incursion is estimated to exceed $100,000.

35.    Water intrusion into the home was also a chronic and longstanding problem, not a one-time event as Sellers disclosed. Mold infestation is one result of that intrusion. Preliminary investigation has further revealed that structural walls are water damaged. In the best case, roughly 30% of the dwelling will need to be demolished and rebuilt from the foundation up. The preliminary structural engineering report is attached as **Exhibit 3**.

36.    Since the snow melted, Plaintiffs have been able to determine the cause of the water intrusion and subsequent damage. The dwelling sits on a hillside, in the path of water drainage. Rather than funneling the water away, though French drains or other common engineering solutions, Sellers had tacked tarpaulins to the exposed framing, which in many cases were ripped and torn.

37.    In violation of building codes, Sellers had piled soil against framed walls that were not made with treated lumber.

38.    In another case, Sellers had positioned a drain pipe several feet above grade beside the laundry room (presumably to funnel water that pooled to that height against the foundation), the site of the worst mold and hidden structural problems. A copy of the preliminary, civil engineering report is attached as **Exhibit 4**.

## Sellers' Knowledge

39.    Plaintiffs believe that any individual residing on the Juniper Property for a period of time, particularly when the snow was gone and it was supposed to be dry, would have known about or reasonably suspected the chronic mold, rodent infestation, water intrusion and structural damage.

40.    In retrospect, Sellers' actions reveal such knowledge and an intent to conceal, in the drains and tarpaulins they installed, the placement of furnishings and use of locked closet doors to hide the damage, in offering the "litter box" explanation for the suspicious smell and denying Plaintiffs and their inspector access to what turned out to be the most affected areas, in making "disclosures" that referenced old problems long-since fixed, and even bringing in "friends" to make improvements, rather than the third-party contractor Plaintiffs preferred.

41.    Moreover, these Sellers had a higher degree of actual and imputed knowledge than most. Although it is not clear if he has ever held a Colorado license, Mr. Panico holds himself out as an architect and builder. According to the plans submitted to the County, Mr. Panico designed the house and three additions that were built in the mid-1990s.

42.    For the additions, Mr. Panico actually dismissed the general contractor who had signed off on the plans and stated to the County that he would obtain his contractor's license and build the additions himself. Upon information and belief, he did the latter, but not the former.

43.    Mr. Panico's direct activities, as designer, builder, and homeowner, directly and proximately relate to the Property's hidden defects. For example:

- In connection with obtaining the original construction permits and plan approvals, Mr. Panico obtained an engineering study that determined that the house was situated on expanding soils and recommended that that the foundation construction use piers

    drilled into the bedrock for its foundation system.
Notwithstanding, he represented in the Disclosure that Sellers were
not aware of "expansive soil" on the Property;

- Mr. Panico followed that recommendation (pier foundation) for the
original structure, but for the additions constructed in 1993 and
1996, he instead used spread footing foundation, which the
engineers had recommended against; and

- He compounded the problem by using untreated wood for the
framing on the additions and then piling up to six feet of dirt
against the framing, and failing to install the subsurface drainage
indicated in the plans he submitted.

As a result of these choices, all of which were within the Sellers' uniquely exclusive purview and

control (as owner, architect and builder), not only are the additions unusable, the foundations

upon which they sit are not suitable for reconstruction.

### FIRST CLAIM FOR RELIEF
(Intentional Misrepresentation —
As Against Sellers, David E.K. Panico and Janice Lee Panico)

    44.    Plaintiffs reallege and incorporate herein by reference the preceding allegations of

this Complaint.

    45.    Sellers made false written and verbal representations as detailed herein to

Plaintiffs about the condition of the Juniper Property.

    46.    At the time Sellers made the false representations, Sellers knew that the

representations were false, or were acting in reckless disregard of the truth.

    47.    At the time Sellers made the false representations, Sellers knew that Plaintiffs

were relying upon Sellers to provide information about the Juniper Property, and intended to

induce Plaintiffs' reliance upon their statements.

    48.    Plaintiffs justifiably and reasonably relied upon Sellers' false representations.

10902.0200 #347166 v8

49.    Plaintiffs suffered damages as a result, in an amount to be proven at trial, but not less than $500,000.

### SECOND CLAIM FOR RELIEF
(Fraudulent Concealment Nondisclosure —
As Against Sellers, David E.K. Panico and Janice Lee Panico)

50.    Plaintiffs reallege and incorporate herein by reference the preceding allegations of this Complaint.

51.    Sellers failed to disclose and/or concealed material facts to Plaintiffs as detailed herein about the condition of the Juniper Property.

52.    Sellers failed to disclose and/or concealed material facts with the intent that Plaintiffs would take a course of action that they might not have taken had they known the truth.

53.    At the time Sellers failed to disclose the material facts, Sellers knew that Plaintiffs were relying upon Sellers to provide accurate and complete information about the Juniper Property.

54.    Plaintiffs purchased the Juniper Property based upon the belief that the facts were as represented by Sellers, and the assumption that the concealed and/or undisclosed facts did not exist.

55.    Under the circumstances, Plaintiffs' reliance was justified and reasonable.

56.    Plaintiffs suffered damages as a result, in an amount to be proven at trial, but not less than $500,000.

10902.0200 #347166 v8

## THIRD CLAIM FOR RELIEF
(Negligent Misrepresentation —
As Against David E.K. Panico and Janice Lee Panico)

57.    Plaintiffs reallege and incorporate herein by reference the preceding allegations of this Complaint.

58.    Sellers gave false, inaccurate, or incomplete material information to Plaintiffs as detailed herein.

59.    Sellers gave such information to Plaintiffs in the course of a business transaction, the sale of the Juniper Property, from which Sellers stood to benefit.

60.    Sellers gave such information to Plaintiffs for Plaintiffs' use in the business transaction, the sale of the Juniper Property.

61.    Sellers were negligent in communicating the information.

62.    Sellers gave the information with the intent or knowing that Plaintiffs would act or decide not to act in reliance on the information.

63.    Plaintiffs reasonably relied upon the information supplied by the Sellers.

64.    This reliance on the information supplied by the Sellers caused damage to the Plaintiffs, in an amount to be shown at trial, but not less than $500,000.

## FOURTH CLAIM FOR RELIEF
(Negligent Misrepresentation —
As Against Carol Dopkin and CDRI)

65.    Plaintiffs reallege and incorporate herein by reference the preceding allegations of this Complaint.

66.    Carol Dopkin and CDRI gave false, inaccurate, or incomplete material information to Plaintiffs as detailed herein.

10902.0200 #347166 v8

13

67.     Carol Dopkin and CDRI gave such information to Plaintiffs in the course of a business transaction, the sale of the Juniper Property, from which Dopkin and CDRI stood to benefit.

68.     Carol Dopkin and CDRI gave such information to Plaintiffs for Plaintiffs' use in the business transaction, the sale of the Juniper Property.

69.     Carol Dopkin and CDRI were negligent in communicating the information.

70.     Carol Dopkin and CDRI gave the information with the intent or knowing that Plaintiffs would act or decide not to act in reliance on the information.

71.     Plaintiffs reasonably relied upon the information supplied by the Carol Dopkin and CDRI.

72.     This reliance on the information supplied by the Carol Dopkin and CDRI caused damage to the Plaintiffs, in an amount to be shown at trial, but not less than $500,000.

**FIFTH CLAIM FOR RELIEF**
(Breach of Fiduciary Duty Claim —
As Against Carol Dopkin and CDRI acting as Transaction Broker)

73.     Plaintiffs reallege and incorporate herein by reference the preceding allegations of this Complaint.

74.     As a transaction broker, Carol Dopkin and CDRI have statutory duties to exercise reasonable skill and care including, but not limited to, advising the parties regarding the transaction and suggesting that such parties obtain expert advice as to material matters and disclosing to all prospective buyers or tenants any adverse material facts actually known by the broker including but not limited to adverse material facts pertaining to the physical condition of the Juniper Property and any defects in the Juniper Property.

10902.0200 #347166 v8

75.     In the present case, that duty was enhanced by knowledge of Plaintiffs' specific,

health-related requirements, and the fact that Plaintiffs were relying exclusively upon Carol

Dopkin and CDRI to find suitable properties and inspect them for conformance with the needs

Plaintiffs had expressed.

76.     Carol Dopkin and CDRI breached this duty.

77.     As a result of Carol Dopkin and CDRI's breach of their duties, Plaintiffs suffered

damages, in an amount to be shown at trial, but not less than $500,000.

### SIXTH CLAIM FOR RELIEF
(Negligence —
As Against Carol Dopkin and CDRI)

78.     Plaintiffs reallege and incorporate herein by reference the preceding allegations of

this Complaint.

79.     Colorado law places upon real estate professionals an affirmative duty to inform

parties they represent of the scope and limits of such representation. C.R.S § 12-61-808 (2)(a)(1).

80.     Carol Dopkin and CDRI breached this duty.

81.     As the listing brokers on the Juniper Property for close to a year, Carol Dopkin

and CDRI had ample opportunity to inspect the Juniper Property during a variety of seasons and

ensure that it met the specific requirements that Plaintiffs had communicated on a number of

occasions, and was under an affirmative duty to do so.  Had that inspection been performed in a

competent fashion, the problems with the Juniper Property would have been discovered.

82.     Carol Dopkin and CDRI breached this duty.

83.     Morever, as part of the inspection clause in the contract for the Juniper Property,

when Plaintiffs requested assistance in selecting the inspector, and Carol Dopkin and CDRI

agreed to do so, they were required to exercise due care in selecting the inspector, articulating the scope of the assignment, and ensure that the necessary work was performed.

84.    Carol Dopkin and CDRI breached this duty.

85.    As a result of Carol Dopkin and CDRI's breach of their duties, Plaintiffs suffered damages, in an amount to be shown at trial, but not less than $500,000.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor and as against Defendants, and award the following relief:

     a.     Compensatory and consequential damages

     b.     Liquidated damages;

     c.     Punitive damages;

     d.     Injunctive and/or declaratory relief;

     e.     Pre-judgment and post-judgment interest at the highest lawful rate;

     f.     Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and,

     g.     Further relief as justice allows.

**PLAINTIFFS HEREBY REQUEST A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 11th day of May, 2007.

IRELAND, STAPLETON, PRYOR & PASCOE, P.C.

Timothy G. Atkinson
Laura J. Hazen
1675 Broadway, Suite 2600
Denver, Colorado 80202
(303) 623-2700
(303) 623-2062 (Facsimile)

Plaintiffs' Address:

1431 First Street South
Jacksonville, Florida 32250

10902.0200 #347166 v8

17